UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL McCAW,

Plaintiff,

v.

CALIFORNIA CORRECTIONAL
HEALTHCARE SERVICES, et al.,

Defendants.[1]

Case No.: 17-cv-02518 BAS (JLB)

**REPORT AND
RECOMMENDATION FOR ORDER:**

**(1) GRANTING IN PART
DEFENDANTS' MOTION TO
DISMISS; AND**

**(2) DENYING PLAINTIFF'S
MOTION TO AMEND**

**[ECF Nos. 19, 25]**

Before the Court is Defendants' Motion to Dismiss Plaintiff Michael McCaw's complaint as to Defendants Ajmel Sangha and T. Kirby. (ECF No. 25.) Plaintiff brings this action under the Civil Rights Act, 42 U.S.C. § 1983, for the medical care he received while incarcerated at Centinela State Prison ("CEN"). (ECF No. 1.) The Court submits this Report and Recommendation to United States District Judge Cynthia Bashant pursuant

---

[1] California Correctional Healthcare Services has been dismissed as a party to this action (*see* ECF No. 9), but for clarity, the Court has styled the caption as it appears on the docket.

1

to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1 of the Local Rules of Practice for the United States District Court for the Southern District of California. After a thorough review of the complaint, the parties' motion and opposition papers, and all supporting documents, and for the reasons discussed below, the Court **RECOMMENDS** that the District Court **DENY** Defendants' Motion to Dismiss as to Defendant Sangha and **GRANT** Defendants' Motion to Dismiss as to Defendant Kirby. (ECF No. 25.) The Court **FURTHER RECOMMENDS** that the District Court construe Plaintiff's June 13, 2018 filing (ECF No. 19) as a Motion to Amend and **DENY** it.

## I. PROCEDURAL BACKGROUND

Plaintiff, a state prisoner proceeding *pro se* and *in forma pauperis*, initiated the present suit by filing a complaint in this Court on December 15, 2017. (ECF No. 1.) Plaintiff's complaint lists Dr. Ajmel Sangha (Chief Medical Officer), C. Lynch (Supervisor), T. Kirby (Health Care Appeals Coordinator), Dr. Harish Kumar Patel, and California Correctional Healthcare Services as defendants. (*Id.* at 2.)

On December 15, 2017, Plaintiff filed a Motion to Proceed *In Forma Pauperis* ("IFP Motion"). (ECF No. 4.) Judge Bashant denied Plaintiff's IFP Motion but granted Plaintiff forty-five days to either pay the $400 civil filing fee or refile his IFP Motion with a certified copy of his trust fund account statement. (ECF No. 5 at 3.) On January 22, 2018, Plaintiff filed a certified copy of his trust fund account statement. (ECF No. 6.) Accordingly, on April 3, 2018, Judge Bashant granted Plaintiff's IFP Motion but dismissed Plaintiff's claims against California Correctional Healthcare Services and Dr. Patel. (ECF No. 9 at 2, 8.) In addition, Judge Bashant dismissed Plaintiff's supplemental claims (ECF No. 8) for failure to exhaust and denied Plaintiff's request for a preliminary injunction. (ECF No. 9 at 7, 12–13.) Plaintiff's claims against Defendants Lynch, Sangha, and Kirby remain. (*Id.* at 9.)

///

///

///

On April 26, 2018, Plaintiff requested a status summary of the case and indicated an intent to amend his complaint. (ECF No. 12.) On April 26, 2018, the Court provided Plaintiff with a case status and set May 24, 2018, as the deadline for Plaintiff to file a motion to amend his complaint. (ECF No. 15.) On May 30, 2018, Plaintiff requested an extension of time to file a motion to amend his complaint. (ECF No. 17.) On June 4, 2018, the Court extended Plaintiff's deadline to file a motion to amend his complaint to June 30, 2018. (ECF No. 18.) Plaintiff filed a document titled "F.A.C. First Amended Complaint" on June 13, 2018. (ECF No. 19.) However, as discussed below, the Court recommends construing this filing as a motion to amend the complaint and not an amended complaint. *See infra* p. 30.

On October 22, 2018, Defendants moved to dismiss Plaintiff's claims against Defendants Sangha and Kirby. (ECF No. 25.) Plaintiff filed an opposition to Defendants' Motion to Dismiss on December 5, 2018. (ECF No. 29.)

## II.    <u>FACTUAL BACKGROUND</u>[2]

Plaintiff alleges the following in his complaint: Plaintiff is a state inmate incarcerated at CEN in Imperial, California. (ECF No. 1 at 1.) Plaintiff suffers from interstitial cystitis, which causes him to experience frequent and irregular urination. (*Id.* at 22; *see, e.g.*, *id.* at 43.) Plaintiff also suffers from sinus allergies. (*Id.* at 17–18, 22.) Plaintiff is a practicing Muslim and observes the Islamic month of Ramadan, which requires Plaintiff to fast during the daytime. (*Id.* at 8.) Therefore, during Ramadan, Plaintiff must take his prescription medications early in the morning or late at night. (*Id.* at 14.) In sum, Plaintiff alleges in his 118-page complaint that over the span of four years, medical staff at CEN provided him with delayed medical attention and interfered with the

---

[2] The allegations contained in Plaintiff's complaint are accepted as true for purposes of assessing Defendants' Motion to Dismiss only. In addition, this Report and Recommendation does not provide a summary of all of the facts presented in the complaint but only those that are relevant to Plaintiff's claims against Defendants Sangha and Kirby.

administration of his prescription medications by failing to accommodate his fast during Ramadan and wrongfully cancelling his medications.

**A.     Transfer to CEN and Delay in Receiving Urodynamic Testing**

Prior to arriving at CEN, Plaintiff was incarcerated in Lancaster, CA, where he visited a urology specialist at the Antelope Valley Urology Medical Group on March 8, 2012.  (*Id.* at 20, 76.)  The specialist noted an obstruction in Plaintiff's prostate, so he prescribed Plaintiff with Flomax and recommended microwave therapy surgery.  (*Id.*)  Plaintiff was subsequently transferred to CEN, where medical staff denied his request for microwave therapy on April 25, 2012.  (*Id.* at 20, 77.)

On April 19, 2013, medical staff arranged for Plaintiff to see Dr. Fawcett, a urologist.  (*Id.*)  In his Telemedicine Report, Dr. Fawcett noted that Plaintiff had not undergone urodynamic testing, which could help determine whether Plaintiff's condition required surgery.  (*Id.* at 78.)

On December 23, 2014, Dr. Fawcett referred Plaintiff to Dr. Rochester for off-site urodynamic testing.  (*Id.* at 20, 81.)  Dr. Rochester's Office Visit Report indicates that Plaintiff reported urinating frequently—"20 times per day [in] small amounts."  (*Id.* at 81.)  Dr. Rochester also noted that Plaintiff "ha[d] been treated with Flomax" and "denie[d] incontinence, painful urination, and blood in [his] urine."  (*Id.* at 82.)  Dr. Rochester prescribed Plaintiff with Hydroxyzine and recommended that Plaintiff return for a visit in one month.  (*Id.* at 20, 83.)  However, CEN medical staff "cancelled" Plaintiff's Hydroxyzine prescription "without reason" after one month and "refused to send [Plaintiff] back to [Dr.] Rochester or any urologist [and] ignored [his] requests for treatment."  (*Id.* at 20.)  On March 26, 2015, Plaintiff filed a Patient-Inmate Health Care Appeal requesting to see a urologist.  (*Id.* at 84.)

A Medical Progress Note dated October 15, 2015, provides that Plaintiff visited Dr. Von Lintig to request a single cell housing accommodation.  (*Id.* at 102–03.)  Plaintiff told Dr. Von Lintig that his "frequent urination and difficulty voiding cause[d] disturbance with his cellmate."  (*Id.*)  Dr. Von Lintig noted that it was not clear to him why "[Plaintiff] ha[d]

not had any further follow[-up] with Dr. Fawcett and did not undergo the recommended study." (*Id.*) As it had been more than a year since Plaintiff had seen Dr. Fawcett, Dr. Von Lintig "wrote a new Request for Services (RFS) to refer [Plaintiff] back to see Dr. Fawcett for further evaluation and treatment recommendation." (*Id.*)

On November 5, 2015, Plaintiff had a telemedicine consultation with Dr. Fawcett. (*Id.* at 86.) Dr. Fawcett's notes indicate that Plaintiff "continue[d] to have the symptoms very much as he did last year" and "complain[ed] of difficulty urinating, hesitancy, strangury, and poor intermittent stream." (*Id.*) Dr. Fawcett also noted that Plaintiff had not yet undergone urodynamic testing and was not taking any medications for his bladder condition. (*Id.*) Dr. Fawcett recommended that Plaintiff undergo urodynamic testing. (*Id.*)

On November 6, 2015, Dr. Von Lintig filed a Health Care Services Physician Request for Services requesting urodynamic testing for Plaintiff. (*Id.* at 90.) Dr. Sangha approved the request on November 17, 2015, but a note from Dr. Sangha on January 26, 2018, indicates that "provider cancelled" and a telemedicine follow-up would be scheduled. (*Id.*)

On January 28, 2016, Plaintiff had telemedicine consultation with Dr. Fawcett. (*Id.* at 110.) Dr. Fawcett noted that Plaintiff had not undergone urodynamic testing and it was "clear that he still need[ed] to have the testing done to help explain why he ha[d] this trouble urinating." (*Id.*) Dr. Fawcett once again recommended "urodynamic testing with uroflowmetry, complex cystometrogram, and pressure flow study." (*Id.*)

On May 19, 2016, Plaintiff had another telemedicine consultation with Dr. Fawcett. (*Id.* at 24.) Dr. Fawcett noted that Plaintiff "did have the urodynamic testing done," but because Plaintiff "refused the rectal catheter," the testing was impaired "in terms of trying to determine what we wanted to know." (*Id.*) Dr. Fawcett also noted that Dr. Rochester had previously suggested Plaintiff suffered from interstitial cystitis, but his symptoms had not included pain, which is "the primary symptom of interstitial cystitis." (*Id.* at 24–25.) Dr. Fawcett's impression remained that Plaintiff instead suffered from a "bladder neck obstruction" that could be fixed with a "bladder neck incision." (*Id.* at 24.) The usual

result of the incision was an "improvement in urination and [the] ability to get off . . . medications." (*Id.*) However, Plaintiff viewed surgery as a "last resort," so Dr. Fawcett "agreed to try medications for interstitial cystitis before deciding to do surgery." (*Id.* at 24–25.) Dr. Fawcett prescribed Plaintiff with Hydroxyzine, Amitriptyline, and Elmiron to treat his possible interstitial cystitis. (*Id.* at 8, 25.) Dr. Sangha signed off on Dr. Fawcett's order for medication. (*Id.* at 26.)

**B.   Administration of Prescription Medications During and After Ramadan 2016**

On June 21, 2016, nurse practitioner Pamela Velardi[3] ("Nurse Velardi") "called [Plaintiff] into an examination room to explain" that his medications would be nurse-administered "three times a day." (*Id.* at 8, 27.) Plaintiff told Nurse Velardi that he was observing Ramadan and "was required to fast from sun up to sun down," so he could not "take his medications during daylight hours."[4] (*Id.* at 8.) In response, Nurse Velardi told Plaintiff that she "didn't have to accommodate a [M]uslim." (*Id.*) Plaintiff requested that Nurse Velardi assign his medications to him "keep on person" ("KOP"), but Nurse Velardi refused. (*Id.*) However, a note from Nurse Velardi on Plaintiff's June 21, 2016 Medication Reconciliation - Active Medication form indicates that she agreed to postpone Plaintiff's treatment for two weeks, as Plaintiff was fasting. (*Id.* at 27.) On June 22, 2016, Nurse Velardi completed a Nonformulary Drug Request requesting Elmiron for Plaintiff that was approved by Dr. Sangha on June 28, 2016. (*Id.* at 41.)

///

---

[3] Plaintiff does not name Nurse Velardi as a defendant.

[4] In 2016, Ramadan began on June 6 and ended on either July 5 or 6. The Court takes judicial notice of this fact pursuant to *The World Almanac and Book of Facts 2015*, at 702 (Sarah Janssen et al. eds., 2015) (stating that in 2017, the month of Ramadan began on June 6 and each month in the Islamic calendar spans 29 or 30 days). Federal Rule of Evidence 201 permits a court to take judicial notice of two kinds of facts: (1) those that are "generally known within the trial court's territorial jurisdiction"; or (2) those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Sources whose accuracy cannot reasonably be questioned are, for example, an almanac, dictionary, or calendar. *Wayne v. Leal*, No. 07 CV 1605 JM (BLM), 2009 WL 2406299, at *4 (S.D. Cal. Aug. 4, 2009). Additionally, when ruling on a motion to dismiss, a court may consider matters properly subject to judicial notice. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

However, on July 6, 2016, Nurse Velardi "cancelled" Plaintiff's medications and "falsified [his] medical record by falsely claiming that [he had] refused his meds 3 days in a row." (*Id.* at 9–10.) Plaintiff provides a Medication Management Referral form that indeed indicates that he refused to take his nurse-administered medications for three consecutive days, but the form is signed by C. Harris, not Nurse Velardi. (*Id.* at 28.)

On September 7, 2016, Plaintiff met with Nurse Velardi and asked why she did not wait to begin his treatment until after Ramadan. (*Id.* at 9.) Nurse Velardi again told him that "she didn't have to accommodate a [M]uslim." (*Id.*) Following the meeting, Nurse Velardi executed a Rule Violation Report, stating, *inter alia*, that she explained to Plaintiff that she "did not agree with [Dr. Fawcett's] recommendations." (*Id.* at 30.) Also following the meeting, Plaintiff filed a Health Care Services Request Form and sent a letter to Dr. Sangha requesting "healthcare from a doctor other than [Velardi]." (*Id.* at 29.)

On September 16, 2016, Dr. Sangha met with Plaintiff and "promised [Plaintiff] that his treatment would be restored immediately." (*Id.* at 10.) On September 20, 2016, Plaintiff sent another letter to Dr. Sangha recapping their September 16 meeting and Plaintiff's complaints regarding Nurse Velardi. (*Id.* at 37.) Plaintiff also sent a complaint to California Correctional Health Care Services ("CCHCS"). (*Id.* at 38–39.)

On September 26, 2016, Plaintiff was "called out to court" and was away from CEN until March 9, 2017.[5] (*Id.* at 13.) While he was away, Plaintiff "did not get the medications that Dr. Fawcett had prescribed [him] because [Dr.] Sangha had lied [and] hadn't restored [his] medications" as promised during the meeting. (*Id.*) On November 27, 2016, Plaintiff filed an Inmate Grievance Form with the County Jail requesting medications for interstitial cystitis and allergies because he was "in pain." (*Id.* at 42.)

///

---

[5] Plaintiff does not state where he was "called out" to, but from the records attached to the complaint, it appears Plaintiff was housed in the Los Angeles County Jail ("County Jail") during this time. (*See* ECF No. 1 at 42.)

On November 7, 2016, CCHCS responded to Plaintiff's September 20 complaint. (*Id.* at 74.) In its letter, CCHCS noted that Plaintiff's healthcare records showed that he had an August 19, 2016 telemedicine consultation with a urology specialist—presumably Dr. Fawcett—who noted that Plaintiff had not begun the three-drug treatment. (*Id.*) However, Dr. Fawcett's notes indicated that Plaintiff had told Dr. Fawcett that he was concerned about the drugs' "interference with [his] mental acuity, drowsiness and frequent court proceedings." (*Id.*) Dr. Fawcett noted that he would "withhold medication now" and "reconsider medication once [Plaintiff's] legal issues [were] settled." Dr. Fawcett recommended a follow-up appointment in four months. (*Id.*)

Upon returning to CEN, Plaintiff filed a Health Care Services Request Form on March 15, 2017, requesting to see a doctor "about some issues having to do with urology, a urologist, and medications and treatments that were prescribed to [him]." (*Id.* at 45.) On April 7, 2017, Plaintiff had a telemedicine consultation with Dr. Fawcett. (*Id.* at 43.) Dr. Fawcett noted that Plaintiff had not started the three-drug treatment. (*Id.*) Dr. Fawcett prescribed Plaintiff with Elmiron, Amitriptyline, and Cetirizine to "hopefully restore the bladder lining [while] diminishing pain" and recommended a follow-up consultation in three months. (*Id.*) Plaintiff states that "he finally got his medication" following the consultation with Dr. Fawcett. (*See id.* at 13.)

On April 18, 2017, Plaintiff signed a Refusal of Examination and/or Treatment form confirming that he refused to take the Amitriptyline prescribed by Dr. Fawcett for three consecutive days. (*Id.* at 13, 46.) Accordingly, his Amitriptyline prescription was "discontinued." (*Id.* at 14.)

## C. Administration of Prescription Medications During Ramadan 2017

When Ramadan began in 2017,[6] Plaintiff explained to the nurses administering his medications that Ramadan required him to fast during daylight hours. (*Id.*) Plaintiff

_____

[6] In 2017, Ramadan began on May 26 and ended on either June 24 or 25. The Court takes judicial notice of this fact pursuant to *The World Almanac and Book of Facts 2015*, *supra* note 3, at 702. Plaintiff

acknowledges that "[w]hen your medications are ordered nurse administered, as they were for me, you['re] required to receive your medications from the nurse at the time appointed, and then take them in front of her." (*Id.*) However, Plaintiff arranged with his "regular" nurses to give him his medication in a plastic bag, "per their judgment," so that he could take the medication at his convenience. (*Id.*) Plaintiff also provides his June 15, 2017 Medication Administration Record that shows various times medical staff administered Plaintiff's medications early or late based on "nursing judgment." (*Id.* at 47.)

This arrangement continued successfully until June 12, 2017, when an unfamiliar nurse was working at the CEN pharmacy and his supervisor, Defendant Lynch, refused to allow the nurse to give Plaintiff his medications in a bag. (*Id.*) Defendant Lynch told Plaintiff that she did not "have to accommodate a [M]uslim" and that "it was unlawful for [Plaintiff] to be given or take the medications at any other times except the times prescribed by a [CCHCS] doctor." (*Id.* at 15.)

That same day, Dr. Sangha sent an e-mail to Dr. Rohrdanz and Dr. Garcia stating that Plaintiff had "refused a non-sensitive medication for 50% of all non-sensitive medication orders in the last week OR [Plaintiff had] 3 days of refused in the last week" and asked that this be addressed in a follow-up visit. (*Id.* at 54.) Plaintiff states that Dr. Sangha lied in this e-mail, and he did not refuse his medications. (*Id.* at 16.) Plaintiff further states that Dr. Rohrdanz cancelled his medications "upon the prejudicial behest of Lynch." (*Id.*)

Despite this alleged cancellation, the "regular" nurses administered Plaintiff's medication "as usual without incident" on June 13 and 14. (*Id.* at 15.) However, on June 15, Defendant Lynch went to Plaintiff's cell and demanded that he sign a medication refusal form, but Plaintiff refused to sign. (*Id.*) A June 14 Refusal of Examination and/or Treatment form signed by Defendant Lynch provides that Plaintiff was "refusing only to

---

erroneously states that Ramadan began in the beginning of June and ended in the beginning of July in 2017. (ECF No. 1 at 14.)

take scheduled medications [(Cetirizine and Elmiron)] in the morning" and that he was "[w]illing to take [the medications] in the evening." (*Id.* at 52.) When Plaintiff "left to get [his] meds that afternoon," the "regular" nurse told him that Defendant Lynch had cancelled his prescriptions, but the nurse "gave them to [him] anyway." (*Id.* at 15.) A June 15 Medication Administration Record provides that Plaintiff received two doses of Elmiron and one dose of Cetirizine in the morning, per "nursing judgment," and one dose of Elmiron in the evening. (*Id.* at 47.)

On June 16, 2017, a nurse at the clinic told Plaintiff that Defendant Lynch had "restored [his] Elmiron medication for the nighttime dose," but his morning dose was "cancelled until after [R]amadan," and his Cetirizine prescription "was cancelled forever." (*Id.* at 16.) However, Plaintiff provides a Medication Administration Record that shows he received a morning dose of Elmiron and Cetirizine at 6:11 PDT that day. (*Id.* at 59.) Plaintiff filed a Health Care Service Request form regarding Lynch's alleged cancellation of his medications and refusal to accommodate him during Ramadan. (*Id.* at 58.)

On June 18, 2017, Plaintiff wrote a letter to Dr. Sangha explaining his arrangement with his "regular" nurses to receive his medications before daylight, Defendant Lynch's failure to accommodate him during Ramadan, and her cancellation of his prescriptions. (*Id.* at 48.) Plaintiff complained that on June 17 "the computer showed that [Defendant] Lynch cancelled all medications on [June 15] [and] then reinstated them partially on [June 16]. But when [he] went to get [his] meds on [June 18], the computer showed [that Defendant] Lynch cancelled everything once again." (*Id.* at 49.) Plaintiff also complained that Dr. Sangha's "staff determined that all [his] medication should be nurse administered." (*Id.* at 48.) A stamp on the letter indicates that CEN's Health Care Services Division received the letter on June 22. (*Id.*)

On June 23, 2017, Defendant Kirby, the CEN Healthcare Appeals Coordinator, responded to Plaintiff's letter to Dr. Sangha and outlined the proper process for Plaintiff to file a healthcare appeal. (*Id.* at 62.) Plaintiff states that Defendant Kirby's actions went "beyond deliberate indifference" because Defendant Kirby "had the medication, knew

17-cv-02518 BAS (JLB)

[Plaintiff] had a right to the medication, knew [Plaintiff] was suffering[7] without the medication[, and] refused to give it to [him]." (*Id.* at 17.)

On June 20, 2017, Plaintiff sent a letter to CCHCS wherein he complained that "an annual protocol [had not] been set up . . . for nurse administered medications for Muslims during the month of [R]amadan." (*Id.* at 17, 61.) On September 14, 2017, CCHCS responded to Plaintiff's letter, noting that Plaintiff's records indicated that:

> on June 14, 2017, nursing staff documented [his] refusal to take medication in the morning due to Ramadan, but [he was willing] to take medication in the evening. On June 16, 2017, the primary care provider ordered [his] medication to be administered p.m. only. On June 26, 2017, the primary care provider submitted an order to resume [his] medications twice a day post-Ramadan.

(*Id.* at 63.) CCHCS explained that "[p]rocedures related to medication management . . . are outlined in the Inmate Medical Services Policies and Procedures, Volume 4, Chapter 11, Medication Management Policy" and that although Plaintiff's "personal preferences may be considered," they "do not control the professional judgment of [Plaintiff's] current healthcare providers." (*Id.* at 63–64.) CCHCS also explained that "[r]eligious programs is not a health care services issue over which [CCHCS] has jurisdiction. As such, [Plaintiff's] concerns should be addressed through the appropriate custody channels at [CEN]." (*Id.* at 63.)

A Medication Administration Record shows that on June 19, 2017, Plaintiff received his Elmiron prescription twice in the evening. (*Id.* at 59.) On June 20 through 25, Plaintiff received his Elmiron prescription once in the evening. (*Id.* at 60.)

///

---

[7] The suffering Plaintiff refers to was seemingly caused by allergies—not interstitial cystitis. Plaintiff states that "for 3 months [he] went through complete agony due to [his] allergies. [He] couldn't sleep because [he] couldn't breathe because [his] nose was so clogged. When [he] did fall asleep, he would wake up [and] have sneezing bouts for 40 minutes at a time. [He] scratched [his] eyes so much that [he] cut the inside of [his] eyelid and got permanent black eyes." (ECF No. 1 at 18.)

17-cv-02518 BAS (JLB)

**D.      Administration of Prescription Medications After Ramadan 2017**

On July 27, 2017, Plaintiff filed a Health Care Services Request "detailing a need for allergy meds." (*Id.* at 18, 65.)  Plaintiff wrote that Defendant Lynch had discontinued his Cetirizine prescription, and he had "black eyes from itching so much." (*Id.* at 65.)  He requested that both his Cetirizine and Nasacort prescriptions be refilled.  (*Id.*)  When Plaintiff was "called to the clinic" he was told that he "would have to wait until [the] doctor got off vacation before [he] could get a prescription." (*Id.* at 18.)

On August 18, 2017, Plaintiff filed another Heath Care Services Request for a Nasacort prescription because he was "in complete agony" from allergies. (*Id.* at 18, 66.)  On August 29, 2017, Plaintiff was "called in" by Nurse Wyatt regarding the doctor's continued absence. (*Id.* at 18.)  Plaintiff told Nurse Wyatt that "they still had a 3[-]month supply of Cetirizine in the [drawer] for [him]." (*Id.*)  Nurse Wyatt responded that CEN records showed that Plaintiff's Cetirizine had been "sent back to the pharmacy without explanation even though the physician (Fawcett) ordered that [Plaintiff] take them until [October 10,] 2017." (*Id.*)  Nurse Wyatt then gave Plaintiff a pack of "24 pills that gave 4 hour [allergy] relief." (*Id.* at 19.)  These pills lasted Plaintiff four days. (*Id.*)

On September 8, 2017, Plaintiff had a telemedicine consultation with Dr. Fawcett. (*Id.* at 68.)   In his notes, Dr. Fawcett states:

> [Plaintiff] is seen in follow[-]up of his interstitial cystitis.  Once again, [Plaintiff] has been having great difficulty getting his medications over the interval.  They have been stopped and started, interrupted.  It is unclear to me why it is so difficult to get this man his medications.  He has at least had the Elmiron for a period of maybe 6 weeks.  In that short period of time, he was able to see some improvement in his urination.  The pain is better by far. . . . Overall, he is happy to see some improvement.  He is having no problems from the medications.  He did choose to not take the amitriptyline . . . [, but because] it is primarily for relief of pain with some assistance in sleeping at night, the effect is not something we deem absolutely necessary.

(*Id.*)  Dr. Fawcett again prescribed Elmiron and Cetirizine to treat Plaintiff's interstitial cystitis.  (*Id.*)  Office/Clinic Notes dated September 8, 2017, provide that Plaintiff's

medication list was updated with nurse-administered Elmiron and KOP Triamcinolone (nasal spray).  (*Id.* at 71.)

On September 20, 2017, after Plaintiff had endured "3 months of misery because of [his] allergies," Dr. Rohrdanz prescribed Plaintiff with Cetirizine.  (*Id.* at 16, 73.)  That same day, Plaintiff filed a Heath Care Services Request form asking why his Elmiron prescription had been discontinued.  (*Id.* at 73.)  A note on the request dated September 21 indicates that Dr. Rohrdanz renewed Plaintiff's prescriptions but was waiting for approval by Dr. Sangha because the prescriptions were non-formulary.  (*Id.*)  Dr. Sangha seemingly approved the prescriptions, for Plaintiff's medical records attached to his complaint show an Elmiron prescription dated September 21, 2017, prescribed by Dr. Sangha, and a Cetirizine prescription dated September 20, 2017, prescribed by Dr. Rohrdanz.  (*Id.* at 72.)

## III.  DISCUSSION

### A.  Legal Standards

#### 1.  Motion to Dismiss for Failure to State a Claim

The Federal Rules of Civil Procedure require that a plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The pleading standard that Rule 8 announces does not require detailed factual allegations, and the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

A motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), tests the legal sufficiency of the claims in the complaint.  *See Twombly*, 550 U.S. at 555.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In ruling on a Rule 12(b)(6) motion to dismiss, the court does not look at whether the plaintiff will "ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court may consider allegations contained in the pleadings, exhibits attached to the complaint, and documents and matters properly subject to judicial notice. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007); *Roth v. Garcia Marquez*, 942 F.2d 617, 625 n.1 (9th Cir. 1991). The court must assume the truth of the facts presented and construe all inferences from them in the light most favorable to the nonmoving party. *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir. 1992). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

### 2. Standards Applicable to *Pro Se* Litigants

With respect to an inmate who proceeds *pro se*, his factual allegations, "however inartfully pleaded," must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (reaffirming that this standard applies to *pro se* pleadings post-*Twombly*). Thus, where a plaintiff appears *pro se* in a civil rights case, the Court must construe the pleadings liberally and afford plaintiff any benefit of the doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). However, in giving liberal interpretation to a *pro se* civil rights complaint, courts may not "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "The plaintiff must allege with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim." *Jones v. Cmty.*

*Redevelopment Agency of L.A.*, 733 F.2d 646, 649 (9th Cir. 1984) (internal quotation omitted).

**B.  Analysis**

In his complaint, Plaintiff asserts a cause of action of "right to medical care, freedom from cruel and unusual punishment" pursuant to the Eighth Amendment.  (ECF No. 1 at 3.)  Defendants move to dismiss Plaintiff's Eighth Amendment claims against Defendants Sangha and Kirby and argue that Plaintiff fails to state a claim of deliberate indifference against them.  (*See* ECF No. 25.)

1.  Eighth Amendment Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with deliberate indifference to an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  For a prisoner to demonstrate an Eighth Amendment violation, two components must be satisfied.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the deprivation alleged must be sufficiently serious.  *Id.* at 1059–60.  A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  *Id.* (citing *Estelle*, 429 U.S. at 104).  The existence of "any injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" are examples of indications that a prisoner has a "serious" need for medical treatment.  *Id.*; *accord Lopez v. Smith*, 203 F.3d 1122, 1131–32 (9th Cir. 2000).

Here, Plaintiff does not specifically allege what serious medical needs exist that would satisfy the first element of an Eighth Amendment deliberate indifference claim.  However, at times in the complaint, Plaintiff alleges that he suffers from sinus allergies (ECF No. 1 at 16–19) and a "condition" that causes irregular and frequent urination (*id.* at 22).  Various medical records attached to his complaint identify this condition as interstitial

15

cystitis. (*Id.* at 24–25, 41, 43, 68, 70.) The complaint and attached medical records show that Plaintiff was treated and received medication for interstitial cystitis and for allergies. *See McGuckin*, 974 F.2d at 1059–60. Further, Defendants do not dispute that Plaintiff adequately alleges a serious medical need. (*See* ECF No. 25-1.) Thus, for purposes of this Motion to Dismiss, the Court liberally construes the complaint and concludes that Plaintiff pleads facts sufficient to state the first element of an Eighth Amendment deliberate indifference claim.

Second, the prison officials involved must have acted with deliberate indifference to the inmate's serious medical needs. *See Wilson v. Seiter*, 501 U.S. 294, 302–04 (1991). A prison official's deliberate indifference can be manifested "in their response to the prisoner's needs" or through "interfering with the treatment once prescribed." *Wood v. Housewright*, 900 F.2d 1332, 1337 (9th Cir. 1990) (quoting *Estelle*, 429 U.S. at 104). To establish deliberate indifference, a prisoner need not prove that he was completely denied medical care. *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir.1989). Rather, he can prevail by showing that officials intentionally interfered with his medical treatment. *See Estelle*, 429 U.S. at 105.

Deliberate indifference is a subjective requirement. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994). To act with deliberate indifference, a prison official must know of and disregard an excessive risk to the inmate's health and safety. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2002) (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). "Even if a prison official *should* have been aware of the risk, if he 'was not, then he has not violated the Eighth Amendment, no matter how severe the risk.'" *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (quoting *Gibson*, 290 F.3d at 1188).

To amount to an Eighth Amendment violation, deliberate indifference to an inmate's serious medical needs must be substantial; inadequate treatment due to malpractice, or even

gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Toguchi*, 391 F.3d at 1060. A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. *McGuckin*, 974 F.2d at 1060.

### 2. Supervisor Liability

The United States Supreme Court has held that there is no vicarious liability for civil rights violations. *Iqbal*, 556 U.S. at 676–77; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Thus, under § 1983, "[a] supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a 'sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)); *see also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

To demonstrate a sufficient causal connection, "a plaintiff must show [that] the supervisor breached a duty to [the] plaintiff which was the proximate cause of the injury." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)). "'The requisite causal connection can be established by setting in motion a series of acts by others' . . . or by 'knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* at 1207–08 (first quoting *Redman*, 942 F.2d at 1447; and then quoting *Dubner v. City & County of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.").

When a named defendant in a § 1983 case holds a supervisory position, the causal link between that defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the

involvement of official personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

For the reasons discussed below, the Court finds that Plaintiff sufficiently alleges that Dr. Sangha was deliberately indifferent to his serious medication needs when he promised to restore his prescription medications in 2016 but failed to do so. The Court finds that Plaintiff fails to sufficiently allege that Defendant Kirby was deliberately indifferent to Plaintiff's serious medical needs in his role as a supervisor.

### 3.  Defendant Sangha

Plaintiff alleges that Dr. Sangha is CEN's Chief Medical Officer. (ECF No. 1 at 2.) Although Plaintiff's complaint spans 23 pages with an additional 95 pages of attachments, facts and allegations pertaining to Dr. Sangha are limited. Plaintiff makes several references to "deliberate indifference" throughout his complaint but never specifically alleges *what* serious medical needs Dr. Sangha was deliberately indifferent to or *how* Dr. Sangha acted with deliberate indifference. In his opposition to Defendants' Motion to Dismiss, Plaintiff argues in a conclusory manner that "[Dr.] Sangha was the C.M.O. and signed off on everything, therefore he's liable." (ECF No. 29 at 3.)

Nevertheless, with liberal construction, the Court can find in Plaintiff's assertions the allegation that Dr. Sangha was deliberately indifferent to his interstitial cystitis and/or allergies by failing to restore Plaintiff's medications that were withheld or cancelled by CEN medical staff during Ramadan in 2016. Dr. Sangha promised to restore these medications but failed to do so, and Plaintiff experienced pain as a result. As discussed below, the Court finds this allegation against Dr. Sangha sufficient to state a claim of deliberate indifference. However, the Court finds the other allegations against Dr. Sangha insufficient. For clarity, the Court repeats and summarizes the facts surrounding Plaintiff's allegations against Dr. Sangha.

### a.  *Delay in Urodynamic Testing April 2013–2016*

Plaintiff's complaint details an almost three-year delay in receiving urodynamic testing, but Plaintiff does not allege any facts which tie this delay to Dr. Sangha. As stated

17-cv-02518 BAS (JLB)

above, Plaintiff had his first urology consultation with Dr. Fawcett on April 19, 2013, wherein Dr. Fawcett recommended that Plaintiff undergo urodynamic testing to determine whether he had a bladder stricture that required surgery. (*Id.* at 78.) Plaintiff did not receive urodynamic testing until sometime between January 28, 2016, and May 19, 2016. (*See id.* at 24, 110.) Plaintiff alleges that after his first appointment with Dr. Fawcett, CCHCS "refused to send [him] back to Fawcett or any other urologist until September 26, 2014." (*Id.* at 20, 80.) On December 23, 2014, Dr. Fawcett referred Plaintiff to Dr. Rochester for testing. (*Id.* at 20, 81.) However, it appears that Plaintiff refused urodynamic testing at his appointment with Dr. Rochester.[8]

Plaintiff filed a Patient-Inmate Health Care appeal on March 26, 2015, requesting to see a urologist. (*Id.* at 84.) Plaintiff did not see Dr. Fawcett until November 5, 2015, and Dr. Fawcett again recommended urodynamic testing. (*Id.* at 86.) On November 6, 2015, Dr. Von Lintig ordered urodynamic testing for Plaintiff. (*Id.* at 90.) However, Plaintiff alleges that after Dr. Von Lintig had finally ordered urodynamic testing, "[Dr.] Sangha discontinued treatment with [Dr.] Fawcett," and he "still hasn't been able to complete [the testing]." (*Id.* at 20.)

As alleged, Plaintiff experienced a substantial delay in receiving urodynamic testing, although at one point the delay was exacerbated by his own refusal of the test. However, Plaintiff does not allege any facts that show Dr. Sangha personally participated in delaying his urodynamic testing, or interfered with scheduling the testing. Plaintiff does not allege that Dr. Sangha even knew that Dr. Fawcett had recommended Plaintiff undergo urodynamic testing. Plaintiff does not specifically attribute any delay in testing to Dr. Sangha, and merely states that "CCH[C]S [and] its employees" had a "policy to deny necessary medical care when needed to save money." (*Id.* at 20.)

Further, as to Plaintiff's allegations that Dr. Sangha discontinued treatment with Dr. Fawcett and that Plaintiff never received urodynamic testing, the records attached to the

---

[8] Dr. Rochester's Office Visit Report states that Plaintiff "decline[d] urodynamics." (ECF No. 1 at 81.)

complaint reflect otherwise.[9]  On November 17, 2015, Dr. Von Lintig completed a Heath Care Services Physician Request for Plaintiff to receive urodynamic testing.  (ECF No. 1 at 90.)  This request was approved by Dr. Sangha on November 17, 2016.  (*Id.*)  A January 26, 2016 note from Dr. Sangha on the request indicates that the "provider cancelled," but a telemedicine follow-up would be scheduled.  (*Id.*)  Indeed, two days later on January 28, 2016, Plaintiff had a telemedicine consultation with Dr. Fawcett, who again recommended that Plaintiff undergo urodynamic testing.  (*Id.* at 110.)  Contrary to Plaintiff's assertion that he has not been able to complete his testing, Dr. Fawcett's notes from Plaintiff's May 19, 2016 consultation indicate that "in the interval" Plaintiff "*did have* the urodynamic testing done."  (*Id.* at 24 (emphasis added).)  Accordingly, with respect to any delay in receiving urodynamic testing, Plaintiff has not sufficiently alleged that Dr. Sangha was deliberately indifferent to his serious medical needs.

### b.    *Failure to Restore Prescription Medications in June 2016*

One of the few specific allegations Plaintiff asserts against Dr. Sangha is that Dr. Sangha promised to restore Plaintiff's prescription medications that were cancelled by Nurse Velardi during Ramadan in 2016 but failed to do so.  (*Id.* at 10.)  The Court finds this allegation against Dr. Sanga sufficient to state a claim of deliberate indifference.

As detailed above, Plaintiff received urodynamic testing, but the test results were inconclusive because of Plaintiff's failure to fully cooperate during the testing, as he refused the rectal catheter.  (*Id.* at 24.)  Dr. Fawcett discussed bladder neck surgery to treat a probable bladder neck obstruction.  (*Id.*)  However, Plaintiff declined surgery as he was of the "mindset that surgery would be the last resort."  (*Id.* at 24–25.)  As an alternative to surgery, Dr. Fawcett prescribed Hydroxyzine, Amitriptyline, and Elmiron to treat Plaintiff for possible interstitial cystitis, but noted that Plaintiff had not reported experiencing any

---

[9] When an allegation in the complaint is refuted by an attached document, the Court need not accept the allegation as true.  *Roth*, 942 F.2d at 625 n.1.

pain, thus suggesting Plaintiff suffered from a bladder neck obstruction rather than interstitial cystitis. (*Id.* at 24.) Dr. Sangha approved Dr. Fawcett's order for medication on May 23, 2016. (*Id.* at 26.)

When Ramadan began in June 2016, Plaintiff could not take his medications during the daytime because of his fasting regimen. (*Id.* at 8.) Plaintiff alleges that on June 21, 2016, Nurse Velardi refused to accommodate his fast and provide Plaintiff's nurse-administered medications KOP, which would allow Plaintiff to take them at a time of his choosing. (*Id.* at 8.) Plaintiff also alleges that Nurse Velardi cancelled his prescriptions on July 6, 2016, by falsely claiming that Plaintiff had refused to take his medications for three consecutive days. (*Id.* at 9–10.)

Approximately two months later, on September 7, 2016, Plaintiff wrote Dr. Sangha a letter requesting "healthcare from a doctor other than [Velardi]." (*Id.* at 29.) On September 16, 2016, Dr. Sangha met with Plaintiff and allegedly "promised [Plaintiff] that his treatment would be restored immediately."[10] (*Id.* at 10.) However, on September 26, 2016, Plaintiff was "called out to court" and temporarily transferred to the County Jail. (*Id.* at 13, 42.) Plaintiff alleges that the medical records CEN forwarded to the County Jail "did not reflect Dr. Fawcett's prescriptions."[11] (*Id.* at 13.) On November 27, 2016, Plaintiff filed an Inmate Grievance Form with the County Jail, and stated:

---

[10] Defendants attach Dr. Sangha's Interdisciplinary Progress Notes from the September 16, 2017 meeting to their Motion to Dismiss (ECF No. 25-1 at 14) and cite to *Branch v. Tunnell* for the proposition that "the court may also consider documents attached to the 12(b)(6) motion whose authenticity is not questioned by the opposing party" (*id.* at 7 n.1). 14 F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Defendants substantially misstate the law by omitting the additional requirement that the documents at issue must be documents whose contents are alleged in the complaint. *Id.* at 454 ("[D]ocuments whose contents are alleged in a complaint *and* whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." (emphasis added)). Plaintiff does not refer to the contents of Dr. Sangha's notes in his complaint. Accordingly, the Court cannot consider these notes in making a recommendation on Defendants' Motion to Dismiss.

[11] The Court notes that a letter from CCHCS to Plaintiff details that Plaintiff asked Dr. Fawcett during an August 19, 2016 telemedicine consultation to postpone his medication until his "legal issues were settled." (*Id.* at 74.) Thus, it appears that Dr. Fawcett had not prescribed Plaintiff with any medication when

I get special interstitial medication for my bladder and allergy medication. The penitentiary forwarded my medical record to jail but they still haven't given me the prescribed medications. The doctor said he would take care of it a couple of months ago but hasn't. I need my medications because I'm in pain.

(*Id.* at 42.) Plaintiff alleges that the doctors at the County Jail told Plaintiff "they couldn't give [him] medications for a prescription they couldn't find." (*Id.* at 13.) Plaintiff was away from CEN until March 9, 2017, and during this time he alleges that he did not receive the medications Dr. Fawcett had prescribed "because [Dr.] Sangha had lied [and] hadn't restored any medications" as promised during their meeting.[12] (*Id.*)

The Court construes Plaintiff's assertions as including an implicit claim that Dr. Sangha acted with deliberate indifference to Plaintiff's interstitial cystitis when he promised to restore the interstitial cystitis medications previously prescribed by Dr. Fawcett but failed to do so. Plaintiff does not specifically allege that he informed Dr. Sangha of his interstitial cystitis in his September 7, 2016 letter or during the September 16, 2017 meeting, or that Dr. Sangha was otherwise aware of his condition. However, the medical records attached to the complaint show that Dr. Sangha had approved Dr. Von Lintig's request that Plaintiff undergo urodynamic testing on November 17, 2015 (*id.* at 90), had approved the medications prescribed by Dr. Fawcett for Plaintiff on May 23, 2016 (*id.* at 26), and had approved the medication requested by Nurse Velardi on June 28, 2016 (*id.* at 41). Dr. Sangha's approval of Plaintiff's treatment plausibly suggests that Dr. Sangha had personal knowledge of Plaintiff's bladder condition and his need for the medication. *See Velasquez v. Barrios*, No. 07cv1130–LAB (CAB), 2008 WL 4078766, at *8 (S.D. Cal. Aug. 29, 2008) ("Proof of [deliberate indifference] does not require a

_____

Plaintiff asked Dr. Sangha to restore his treatment.

[12] To their motion, Defendants attach papers showing Plaintiff's transfer back to CEN and argue that Plaintiff's "medical records show that Plaintiff received his medication while he was at Los Angeles County Jail because he was transferred back to [CEN] with those medications." (ECF No. 25-1 at 7, 12– 13.) However, as previously discussed, the Court cannot consider papers outside of the complaint when making a recommendation on Defendants' Motion to Dismiss. *See supra* note 10.

demonstration of express intent to cause harm on the part of the official, by either action or inaction, but the official must have been conscious of a substantial risk to the plaintiff, and yet have acted or failed to act upon that risk in a way that brought serious harm to the plaintiff." (citing *Farmer*, 511 U.S. at 839–40)).

Additionally, Plaintiff's assertions can be read to allege that Dr. Sangha's unfulfilled promise to restore his prescription medications resulted in a seven-month delay in receiving treatment for his interstitial cystitis.[13] (*Id.* at 13, 42.) Deliberate indifference may be manifested "when prison officials deny, delay, or intentionally interfere with medical treatment." *Jett*, 439 F.3d at 1096. Where a prisoner alleges a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. *McGuckin*, 974 F.2d at 1060 (citing *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)). "'Harm' may include significant pain that otherwise need not have been endured, even without physiological damage." *Stanford v. Doe*, No. 08cv1049 H(PCL), 2009 WL 1764837, at *4 (S.D. Cal. Feb. 11, 2009) (citing *Shapley*, 766 F.2d at 407); *see also McGuckin*, 974 F.2d at 1060 ("[A] finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary . . . .").

Here, Plaintiff alleges that Dr. Sangha promised to "immediately" restore his prescription medications during the September 16, 2016 meeting, but Plaintiff did not receive his prescription medications until April 14, 2017, and after a subsequent consultation with Dr. Fawcett. (ECF No. 1 at 10, 13.) Further, the records attached to the complaint provide the allegation that Plaintiff experienced unnecessary pain because of this delay in receiving his medications. In his November 27, 2016 Inmate Grievance Form to the County Jail, Plaintiff stated that he needed his "interstitial medication for [his]

---

[13] Plaintiff states that on April 14, 2017, "after a year of CCH[C]S and it[s] employees preventing me from getting my medications . . . and their chief medical officer, [Dr. Sangha], not restoring my prescription like he was supposed to, I finally got my medication." (ECF No. 1 at 13.)

bladder and allerg[ies]" because he was "in pain." (*Id.* at 42.) Additionally, Dr. Fawcett's notes from his April 7, 2017 telemedicine consultation with Plaintiff state that because Plaintiff did not begin treatment for interstitial cystitis, "[Plaintiff] continue[d] . . . to have his marked urinary urgency and frequency. He describe[d] a constant urge to urinate. There [was] increased suprapubic pressure, becoming painful with any attempt to hold the urine." (*Id.* at 43.) Drawing all reasonable inferences in Plaintiff's favor and construing his *pro se* pleadings liberally as it must at this stage in the litigation, the Court finds that Plaintiff has stated a plausible deliberate indifference claim pursuant to the Eighth Amendment against Dr. Sangha for his failure to restore Plaintiff's interstitial cystitis medications.

### c. Failure to Restore Prescription Medications in June 2017

Plaintiff's complaint also alleges difficulties in receiving his prescription medications because of his fasting during Ramadan in 2017. However, Plaintiff makes only two insufficient allegations against Dr. Sangha during this time. First, Plaintiff alleges that Dr. Sangha lied in his June 12, 2017 e-mail when he wrote that Plaintiff "was refusing [his] meds." (*Id.* at 16.) Second, Plaintiff alleges that he wrote Dr. Sangha a letter regarding Defendant Lynch's cancellation of his medications, but Dr. Sangha did not reorder his Cetirizine in response to the letter. (*Id.* at 17.)

As detailed above, during Ramadan in 2017, "regular" nurses would use their "judgment" and give Plaintiff his nurse-administered medications KOP to accommodate his fast. (*Id.* at 14.) However, on June 12, 2017, Defendant Lynch refused to give Plaintiff his medications KOP. (*Id.* at 15.) That same day, Dr. Sangha sent an e-mail to Dr. Rohrdanz and Dr. Garcia stating that Plaintiff had "refused a non-sensitive medication for 50% of all non-sensitive medication orders in the last week OR [Plaintiff had] 3 days of refused [medication] in the last week" and asked that this be addressed at a follow-up visit. (*Id.* at 54.) Plaintiff contends that this e-mail was a lie, and he never refused his medication. (*Id.* at 16.)

///

After June 12, 2017, the allegations and documentation regarding administration of Plaintiff's medications is muddled, and at times, contradictory. Plaintiff states that Dr. Rohrdanz cancelled his medications "upon the prejudicial behest of [Defendant] Lynch," yet he received his medications "without incident" on June 13 and 14. (*Id.* at 15–16.) However, a September 14, 2017 letter from CCHCS states that Plaintiff's record indicates that "nursing staff documented [Plaintiff's] refusal to take medication in the morning due to Ramadan, but [his] willingness to take medication in the evening" on June 14. On June 15, Plaintiff alleges that a nurse told him that Defendant Lynch had cancelled his prescriptions, yet the nurse "gave them to [him] anyway." (*Id.* at 15.) On June 16, a Medication Administration Report shows that Plaintiff received a morning does of Elmiron and Cetirizine, yet Plaintiff states that Defendant Lynch had cancelled his morning dose of Elmiron and all doses of Cetirizine. (*Id.* at 16, 59.)

On June 18, 2017, Plaintiff sent a letter to Dr. Sangha explaining his arrangement with his "regular" nurses to receive his medications before daylight, Defendant Lynch's failure to accommodate him during Ramadan, and her cancellation of his prescriptions. (*Id.* at 48.) Plaintiff also complained of the medical staff's determination that his prescriptions be nurse-administered. (*Id.*) Curiously, however, Plaintiff in his complaint states that the letter "explained that he was suffering from the refusal of their staff to give [him] the *allergy* meds that were prescribed to [him]." (*Id.* at 17 (emphasis added).) Plaintiff wrote in the letter that he had "black eyes from rubbing [his] itching eyes because [he did not] have the Cetirizine." (*Id.* at 49.) Plaintiff further states that "all [Dr.] Sangha . . . had to do was order them to start giving me my meds again and problem solved." (*Id.* at 17.) Plaintiff received at least his evening dose of Elmiron until the end of Ramadan. (*See id.* at 59–60.)

Again, the only allegations Plaintiff makes against Dr. Sangha during this time is that Dr. Sangha lied in his e-mail to Dr. Rohrdanz and Dr. Garcia and that Dr. Sangha did not reorder Cetirizine for Plaintiff's allergies after Plaintiff sent him a letter. (*Id.* at 16–17.) Concerning Dr. Sangha's e-mail, Plaintiff states that the "decision to cancel [his] meds

came on, or started on [June 12, 2017] with an e[-]mail from [Dr.] Sangha to [Dr.] Rohrdanz where he lied by telling [Dr.] Rohrdanz that [Plaintiff] was refusing [his] meds." (*Id.* at 16.) However, Plaintiff attached this e-mail to the complaint, and Dr. Sangha did not order Plaintiff's prescriptions to be cancelled. (*Id.* at 54.) Dr. Sangha simply requested that Plaintiff's refusal to take his medications be addressed "with a follow[-]up visit." (*Id.*) Additionally, Plaintiff fails to adequately allege that Dr. Sangha knew his assertion that Plaintiff had refused his medications was a lie.

Plaintiff also alleges that he sent a letter to Dr. Sangha detailing Defendant Lynch's cancellation of his medications, specifically his Cetirizine prescription, which caused him to suffer from allergies. (*Id.* at 17, 49.) The Court construes this allegation as one against Dr. Sangha in his capacity as a supervisor. To adequately allege a deliberate indifference claim based on supervisory liability, Plaintiff must demonstrate a sufficient causal connection between Dr. Sangha's conduct and a constitutional violation by his subordinate. *Crowley*, 734 F.3d at 977. Plaintiff seemingly attempts to establish this causal connection by asserting that Dr. Sangha had knowledge of Defendant Lynch's alleged constitutional violations via his letter but failed to act. *See Starr*, 633 F.3d at 1196 ("[A] plaintiff may state a claim for supervisory liability based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by others."). However, Plaintiff does not plausibly allege that Dr. Sangha knew of any constitutional violations committed by Defendant Lynch.

The record shows that Plaintiff's letter to Dr. Sangha regarding Defendant Lynch was stamped "received" by CEN's Health Care Services Division and was responded to by Defendant Kirby. (ECF No. 1 at 48, 62.) Plaintiff does not allege that Dr. Sangha ever received his letter, nor does Plaintiff allege that Dr. Sangha otherwise knew of Defendant Lynch's cancellations of his prescription medications or that he suffered from allergies.[14]

_____

[14] Plaintiff does not allege that his interstitial cystitis was adversely affected by any delay in receiving his prescription medication during Ramadan in 2017. Plaintiff instead alleges that the lack of Cetirizine

Plaintiff's supporting documentation only reflects that Dr. Sangha had been made aware that Plaintiff was refusing to take his medications and had asked Dr. Rohrdanz and Dr. Garcia to address this in a follow-up visit with Plaintiff.  (*Id.* at 54.)

Based on the facts in the complaint as alleged, the Court cannot draw a reasonable inference that Dr. Sangha acted with deliberate indifference to Plaintiff's serious medical needs in his role as a supervisor during Ramadan in 2017.

### d.    Administration of Prescription Medications After Ramadan in 2017

Plaintiff's complaint is devoid of allegations against Dr. Sangha after Ramadan ended in 2017.  A September 17, 2017 CCHCS letter states that Plaintiff's medical records reflected that "[o]n June 26, 2017, the primary care provider submitted an order to resume [Plaintiff's] medication twice a day post-Ramadan."[15]  (*Id.* at 63.)  However, Plaintiff alleges that he didn't get his "allergy medication of Cetirizine [back] until [September 20, 2017]."  (*Id.* at 17.)

Plaintiff details multiple Health Care Services Requests he made for allergy medication in July and August of 2017.  (*See id.* at 18, 65–66.)  On September 8, 2017, Plaintiff had a telemedicine consultation with Dr. Fawcett, and Dr. Fawcett again prescribed Plaintiff with Elmiron and Cetirizine to treat his interstitial cystitis.  (*Id.* at 68.)  On September 20, Plaintiff filed a Heath Care Services Request form asking why his Elmiron prescription was discontinued.  (*Id.* at 73.)  A note on the form dated September 21 indicates that Dr. Rohrdanz renewed Plaintiff's prescriptions but was waiting for approval by Dr. Sangha.  (*Id.* at 73.)  Dr. Sangha seemingly approved his prescriptions, for the medical records attached to the complaint show an Elmiron prescription dated September 21, 2017, and prescribed by Dr. Sangha.  (*Id.* at 72.)  This is the only mention of Dr. Sangha after Ramadan in 2017 in the complaint.  Therefore, to the extent Plaintiff

---

caused him to suffer from allergies.  (ECF No. 1 at 16–17.)  The Court notes that Dr. Fawcett prescribed Cetirizine to treat Plaintiff's interstitial cystitis—not for allergy relief.  (*See id.* at 24–25, 43, 68.)
[15] In 2017, Ramadan ended on either June 24 or 25.  *See supra* note 6.

attempts to allege that Dr. Sangha was deliberately indifferent to his allergies or interstitial cystitis due to a delay in receiving treatment after Ramadan in 2017, Plaintiff does not provide any facts that would plausibly support this.

Nevertheless, for the reasons discussed above, Plaintiff alleges a viable Eighth Amendment deliberate indifference claim against Dr. Sangha. Construing the complaint liberally, the Court finds that Plaintiff plausibly alleges that Dr. Sangha acted with deliberate indifference to his serious medical needs when he failed to restore Plaintiff's prescription medications in 2016 after promising to do so. Accordingly, the Court **RECOMMENDS** that Defendants' Motion to Dismiss with respect to Plaintiff's Eighth Amendment claim against Dr. Sangha be **DENIED**.

### 4. Defendant Kirby

Defendant Kirby is a Healthcare Appeals Coordinator at CEN. (*Id.* at 62.) Plaintiff does not allege that Defendant Kirby provided medical care to Plaintiff. Rather, Plaintiff appears to rely solely on a theory of supervisory liability to assert his claims against Defendant Kirby. However, Plaintiff fails to state a claim against Defendant Kirby, as he makes only conclusory allegations against him.

As discussed above, Defendant Kirby responded to Plaintiff's June 18, 2017 letter addressed to Dr. Sangha and outlined the proper procedure for inmates to submit a health care appeal. (*Id.* at 62.) Plaintiff, however, alleges that "[Defendant] Kirby ignored [his] reported suffering [and] right to the supply of medication that had been prescribed [and] ordered for [him]." (*Id.* at 17.) Plaintiff further states that Defendant Kirby's actions went "beyond deliberate indifference" because Defendant Kirby "had the medication, knew [Plaintiff] had a right to the medication, knew [Plaintiff] was suffering without the medication[, and] refused to give it to [him]." (*Id.*)

Plaintiff's allegations against Defendant Kirby in the complaint are conclusory and insufficient to state a claim of deliberate indifference. Plaintiff fails to plead any facts that could reasonably be construed as Defendant Kirby's personal participation in a constitutional violation. In the absence of personal involvement, Plaintiff must

demonstrate a sufficient causal connection between Defendant Kirby's conduct and a constitutional violation by a subordinate. *Crowley*, 734 F.3d at 977. Plaintiff fails to do so here. Plaintiff merely concludes without factual support that Defendant Kirby was deliberately indifferent because he knew Plaintiff was suffering and refused to give Plaintiff medication.

Thus, Plaintiff fails to sufficiently allege an Eighth Amendment deliberate indifference claim against Defendant Kirby. Accordingly, the Court **RECOMMENDS** that Defendants' Motion to Dismiss with respect to Plaintiff's Eighth Amendment claim against Defendant Kirby be **GRANTED**.

## C. Leave to Amend

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a court should grant leave to amend when justice so requires "even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (citation omitted). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995); *see also Carvalho v. Equifax Info. Servs.*, LLC, 629 F.3d 876, 893 (9th Cir. 2010). A court may properly deny leave to amend where a plaintiff has already amended the complaint and does not correct the deficiencies that caused the original complaint to fail to state a claim on which relief can be granted. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809–10 (9th Cir. 1988) ("Repeated failure to cure deficiencies by amendments previously allowed is [a] valid reason for a district court to deny a party leave to amend.") (citation omitted). The "district court's discretion over amendments is especially broad where the court has already given a plaintiff one or more opportunities to amend his complaint." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987) (citations omitted).

As discussed above, the Court finds that Plaintiff has failed to state an Eighth Amendment deliberate indifference claim against Defendant Kirby. However, the Court does not at this time find that amendment of the complaint would be futile. Further, given

29

that this is Plaintiff's first attempt to state a claim against Defendants Kirby, the Court finds that justice requires leave to amend. Accordingly, the Court **RECOMMENDS** that Plaintiff's Eighth Amendment claim against Defendant Kirby be **dismissed without prejudice and with leave to amend**.[16]

## IV. <u>MOTION FOR LEAVE TO AMEND</u>

As stated above, the Court recommends construing Plaintiff's June 13, 2018 filing titled "F.A.C. First Amended Complaint" (ECF No. 19) as a motion to amend the complaint.

By way of background, on April 26, 2018, Plaintiff filed a letter requesting a "status summary of the case." (ECF No. 11.) Plaintiff also attempted to file supplemental evidence on the docket, but the Court rejected these filings, as supplemental pleadings require court order. (*See* ECF Nos. 13–14.) In response to Plaintiff's letter and rejected filings, the Court provided Plaintiff with a summary of his case and a deadline of May 24, 2018 to file a motion to amend his complaint. (ECF No. 15.) However, because Defendants had not yet been served with Plaintiff's complaint, Plaintiff could have filed an amended complaint as a matter of course and without leave of court at any time before Defendants were served plus 21 days after service.[17] Fed. R. Civ. P. 15(a)(1)(A).

///

---

[16] Any amended complaint must comply with the requirements of Local Civil Rule 8.2 governing complaints filed by prisoners under § 1983, which provides:

> Additional pages not to exceed fifteen (15) in number may be included with the court approved form complaint, provided the form is completely filled in to the extent applicable in the particular case. The court approved form and any additional pages submitted must be written or typed on only one side of a page and the writing or typewriting must be no smaller in size than standard elite type. **Complaints tendered to the clerk for filing which do not comply with this rule may be returned by the clerk, together with a copy of this rule, to the person tendering said complaint.**

CivLR 8.2 (emphasis added).

[17] Each defendant filed a Waiver of Service on August 30, 2018. (ECF Nos. 20–22.) Pursuant to Rule 4, Plaintiff's complaint is treated as being served at the time the waivers were filed. Fed. R. Civ. P. 4(d)(4).

On May 30, 2018, Plaintiff filed a Motion for Extension of Time to file an amended complaint. (ECF No. 17.) The Court granted Plaintiff's request in part on June 4, 2018, and provided Plaintiff until June 30, 2018, to file a motion to amend his complaint. (ECF No. 18.)

On June 13, 2018, Plaintiff filed a document titled "F.A.C. First Amended Complaint," seemingly in response to the Court's Order setting June 30, 2018, as a deadline for Plaintiff to file a motion to amend his complaint. (ECF No. 19.) However, the Court recommends construing this filing as a motion for leave to amend and denying the motion, as this would result in the outcome most fair to Plaintiff.[18]

Plaintiff's Motion to Amend seeks to add Imperial County as a defendant. (ECF No. 19 at 1.) However, Plaintiff's motion does not comply with this District's Local Civil Rules. Civil Local Rule 15.1 states in pertinent part:

a. **Amended Pleadings.** Every pleading to which an amendment is permitted as a matter of right or has been allowed by court order, must be complete in itself without reference to the superseded pleading.

All amended pleadings must contain copies of all exhibits referred to in such amended pleadings. Permission may be obtained from the court, if desired, for the removal of any exhibit or exhibits attached to prior pleadings, in order that the same may be attached to the amended pleading. Each amended pleading must be designated successively as first amended, second amended, etc.

b. **Motions to Amend.** Any motion to amend a pleading must be accompanied by . . . a copy of the proposed amended pleading . . . .

---

[18] If the Court were to construe the filing as an amended complaint, the Court would have to recommend that it be screened and dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), as it fails to state a claim. Plaintiff's filing merely states that he wishes to amend the complaint to add Imperial County as a defendant and wants "everything else to remain the same in all other respects of the suit, defendants, and original claims." (ECF No. 19 at 1–2.) Plaintiff does not set forth any facts to support liability against Imperial County. Further, Plaintiff cannot incorporate by reference the allegations made in his original complaint to an amended complaint. CivLR 15.1(a). Construing this filing as an amended complaint would also render Defendants' Motion to Dismiss moot.

CivLR 15.1(a)–(b).

Here, Plaintiff's motion merely states that he wishes to amend his complaint to add Imperial County as a defendant and that he wants "everything else to remain the same in all other respects of the suit, defendants, and the original complaint." (ECF No. 19 at 1–2.) Plaintiff did not attach a copy of his proposed amended complaint to his Motion to Amend, and moreover, Plaintiff cannot incorporate by reference the allegations made in his original complaint into an amended complaint. CivLR 15.1(a)–(b). The Court therefore **RECOMMENDS** that Plaintiff's Motion to Amend (ECF No. 19) be **DENIED** for failure to comply with Local Civil Rule 15.1. However, Plaintiff may opt to add Imperial County as a defendant[19] in a First Amended Complaint, if the District Court grants him leave to amend his claims against Defendant Kirby.[20]

///

///

///

---

[19] Although Imperial County may be considered a "person," and therefore a proper defendant under § 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Hammond v. County of Madera*, 859 F.2d 797, 801 (9th Cir. 1988), as a municipality it may be held liable under § 1983 only where the plaintiff alleges facts to show that a constitutional deprivation was caused by the implementation or execution of "a policy, statement, ordinance, regulation, or decision officially adopted and promulgated" by the County, *Monell*, 436 U.S. at 690; *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 402–04 (1997); *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).

[20] In addition to complying to Local Civil Rule 8.2, any amended complaint must comply with the requirements of Local Civil Rule 15.1(a), which provides:

> Every pleading to which an amendment is permitted as a matter of right or has been allowed by court order, **must be complete in itself without reference to the superseded pleading**.

> All amended pleadings must contain copies of all exhibits referred to in such amended pleadings. Permission may be obtained from the court, if desired, for the removal of any exhibit or exhibits attached to prior pleadings, in order that the same may be attached to the amended pleading. Each amended pleading must be designated successively as first amended, second amended, etc.

CivLR 15.1(a) (emphasis added).

17-cv-02518 BAS (JLB)

## V.   CONCLUSION

For the reasons discussed above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) adopting this Report and Recommendation; (2) **GRANTING in part and DENYING in part** Defendants' Motion to Dismiss (ECF No. 25); and (3) **DENYING** Plaintiff's Motion to Amend (ECF No. 19).

**IT IS ORDERED** that no later than **July 17, 2019**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 31, 2019**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  June 26, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge

17-cv-02518 BAS (JLB)